# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FRANCIS T. FOSTER, | ) |
| Plaintiff, | ) |
| v. | ) No. 13 C 3066 |
| PRINCIPAL LIFE INSURANCE COMPANY, | ) Judge Rebecca R. Pallmeyer |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

For many years Francis T. Foster, an attorney, represented committees that managed several retirement plans for transportation workers. Each committee was composed of an equal number of union members and management representatives—an arrangement that worked well until the episode that set this lawsuit in motion, as explained here. When, in early 2011, Foster offered some legal analysis that was unfavorable to management, the plans' appointed fiduciary (or "paying agent"), Defendant Principal Life Insurance Company, stopped paying Foster's retainer for several months. Lawsuits, including this one, followed. Foster has settled with other entities. What is left is his claim that in honoring instructions from a management official to withhold payment from Foster, Principal Life tortiously interfered with Foster's prospective economic advantage.

Both sides have moved for summary judgment. For the reasons explained here, the motions are denied.

## BACKGROUND

The case has a complicated procedural history. Foster filed his complaint in 2013 against Joseph Costello, the Executive Director of the Regional Transportation Authority, as well as Principal Life, on the theory that Costello was instrumental in retaliating against Foster for having expressed a legal opinion that Costello and other management-side officials found distasteful. As against Principal Life, Foster alleged that Principal Life interfered with his

expectations by adhering to unauthorized instructions not to pay his invoices. This court dismissed the claims against both Defendants. *Foster v. Costello*, No. 13 C 3066, 2014 WL 1876247 (N.D. Ill. May 9, 2014). Foster settled his case with Costello but successfully appealed the dismissal of his tortious interference claim against Principal Life. *Foster v. Principal Life Ins. Co.*, 806 F.3d 967 (2015). This court had concluded that Foster's claims against Principal Life was "derivative" of claims he had settled in separate proceedings against the Plan managers, but the Court of Appeals reversed that dismissal and remanded for further proceedings. After a period of discovery, both sides have now moved for summary judgment.

## **FACTS**

The summary judgment record is substantial, but many of Foster's allegations are undisputed. Recognizing that this account rests only on those allegations, deemed true at the pleading stage, the court begins with the Seventh Circuit's summary:

> The Regional Transportation Authority ("RTA") runs six bus lines in northern Illinois under its Pace Suburban Bus Division ("Pace"). Each Pace bus line has its own pension and 401(k) retirement plan (the "Pace Plans"). The RTA also has its own retirement plan, the "RTA Plan." . . . . Each of the Plans is run by a committee composed of an equal number of union and management representatives. The Pace Plans, which are considered private trusts created for the benefit of the covered employees, appointed Principal as the trustee. Principal held title to the assets of the Pace Plans for the benefit of participants and their beneficiaries. As trustee, Principal had a fiduciary duty to follow the terms of the Pace Plan documents.
>
> In 2003, each of the committees for the Pace Plans passed a resolution retaining Foster to act as the lawyer representing the interests of the Plans. The committees instructed Principal to pay Foster a fixed monthly fee from the jointly administered trust funds for the Pace Plans. This arrangement worked without incident for a number of years until January 2011. At that time, Foster notified Pace's Board of Directors ("Pace Board") that one of the Pace Plans was underfunded in violation of the Illinois Pension Code. Foster told the Pace Board that Pace was required to make additional contributions of $181,360 for 2009, and $235,190 for 2010. This was unwelcome news at Pace, and Pace management employees subsequently retaliated by attempting to terminate Foster's employment as lawyer for the Plan committees. But Pace management lacked authority to terminate Foster's employment. Only the Plan committees held the power to terminate Foster and they had not done so.

2

> Foster sent a letter to Pace, informing the company that, under the Pace Plan documents, termination of his representation could be accomplished only by a vote of each of the governing committees of the Pace Plans. Pace responded by attempting to terminate both Foster's representation of the RTA Plan and his fee agreement with the RTA Plan.
>
> . . . .
>
> Foster also sent a letter to the RTA, which has supervisory responsibilities over Pace, informing the RTA that Pace had violated various state and federal laws as a result of these actions. In this same letter, Foster informed the RTA that one of the Pace Plans was underfunded for 2009 and 2010. The executive director of the RTA, Joseph Costello, refused to take any action in response to Foster's letter. Instead, Foster asserted, Costello retaliated against Foster by inducing the RTA Plan committee to terminate Foster's representation of the RTA Plan.

*Foster*, 806 F.3d at 969-70. Although Principal Life challenges the admissibility of certain materials Foster cites, these background facts are essentially undisputed.[1] Principal Life notes that the underfunded Pace Plan, "Pace West Division 401k Plan," was one for which Principal Life was not the "paying agent," and there is no evidence that anyone at Principal Life knew of or was involved in that Plan's alleged violation of its funding obligations under the Illinois Pension Code. (Principal Life Response [146] ¶¶ 7-12.) Principal Life observes, further, that it did not receive copies of correspondence from Pace managers to Foster in which Pace purported to terminate Foster's "retention connection with Pace's Union and Administrative Defined Benefit and Defined Contribution plans." (*Id.* ¶¶ 13, 17; Ellyin letter 2/24/2011, Exhibit A

---

[1] Many of Principal Life's objections to Foster's Statement of Facts are puzzling. For example, in paragraph 5 and 6, Foster lists the eight pension plans for which he acted as counsel and cites his own declaration in support. Principal disputes these paragraphs on hearsay and authenticity grounds (Principal Life's Response to Foster's Statement [146] ¶¶ 5, 6)—but does not suggest why Foster, an attorney, would lack first-hand knowledge of the existence of pension plans for which he was retained. In other instances, Foster's proposed Statement quotes the language of documents verbatim, yet Principal Life objects on the ground that Foster's submission "purports to summarize the contents of a written document, which speaks for itself." (*See, e.g., Id.* ¶¶ 18, 41, 56, 58, 59, 60.) In this court's view, there is no impropriety in summarizing the contents of a written document, and it is incumbent on a party objecting to such summary to identify the ways that the summary is inaccurate. In this case, Foster is often not summarizing at all; he is quoting. Principal Life's objections to Foster's verbatim quotations, as well as its undeveloped FED. R. EVID. 802 and 901 objections, are overruled.

to Foster Motion for Summary Judgment [127-1] at 12.) When Foster responded by letter, asserting that termination of his representation required a vote of the plan committees (Foster Statement of Facts [131] ¶ 14; Foster Exhibit A [127-1] at 15, 23), Pace took further action, also without Principal Life's involvement: Specifically, the Pace Executive Director unilaterally replaced management members of the Pace West Division 401k Plan (Ross letters, 3/29/2011, Foster Exhibit A [127-1] at 35-37); those new committee members then purported to adopt a resolution terminating Foster's employment as an attorney, in the absence of any union committee members and without a quorum. (Foster Exhibit A [127-1] at 38; Principal Life's Response [146], ¶¶ 15, 16.) Similarly, Principal Life was not involved when, in June 2011, the chairman of the RTA 401k Plan Committee notified Foster that his "services to the Plan will end June 30, 2011." (Foster Exhibit A [127-1] at 42; Principal Life Response [146] ¶ 17.) Principal Life notes, further that while the chairman's letter to Foster begins with a reference to Pace's earlier notice of termination (an unauthorized and ineffective notice, according to Foster), the letter itself includes no indication that the RTA was prompted or influenced by Pace's conduct in making its own decision. (*Id.*)

Principal Life has been the paying agent for the Plans at issue in this case for several years, pursuant to a "Service and Expense Agreement" with each Plan, signed by Joseph Ellyin as the Plan Representative on behalf of the Plan committees. (Principal Life's Response [146] ¶¶ 35, 36; Foster Exhibit A-10 [132-11].) (Foster contends that Ellyin in fact signed the Agreements "on behalf of the Pace Plan Committees" [Foster Response to Principal Life's Statement of Facts [156] ¶ 17], but Foster does not explain the distinction, if any, between these characterizations of Ellyin's role in executing the Agreement.) Principal Life notes that under the Service and Expense Agreements, Principal Life is entitled to "rely conclusively on any Notice [it] receive[s]," and is barred from taking any action based on "any form of communication other than either a Notice" or legal order, such as a subpoena. (Principal Life's Statement of Facts

[145] ¶¶ 13, 14, citing Service and Expense Agreements § 3.4; Article IV.) The Agreements provide, further, that Principal Life has no duty to inquire into any notice or communication regarding the Plans and no duty to enforce provisions of the Plan. (Principal Life's Statement of Facts [145] ¶ 15, citing Service and Expense Agreements § 3.4.)

Principal Life asserts that no one other than Ellyin communicated with Principal Life on behalf of the Plans, and that Principal Life relied on directions from Ellyin when it paid Plan expenses. (*Id.* ¶ 22, citing Ellyin Deposition, Exhibit 2 to Principal Life's Cross Motion [145-2]; Affidavit of Darrell Washington, Exhibit 2 to Principal Life Response [146-2], ¶ 9). Foster disputes this only by pointing out that Ellyin's role was to convey information concerning action taken by Plan committee members or Plan participants; he does not challenge Principal Life's assertions that Ellyin was Principal Life's sole contact with the Plans and that Principal Life relied on Ellyin's directions. (Foster Response to Principal Life's Statement of Facts [156] ¶ 22.) In March 2005, Darrell Washington, the "Relationship Manager" for the Plans, received a notice from Joseph Ellyin directing that Principal Life pay Foster's fees at established fixed rates "until direction from [Ellyin] to the contrary." (Foster Response [156] ¶ 24.) From December 2005 through March 2011, Foster submitted an invoice for his fees to Principal Life, and Principal Life paid them. (Principal Life's Response [146] ¶ 40.)

As summarized by the Court of Appeals, this smooth relationship hit difficulty in early 2011. In January of that year, Foster notified Pace's Board of Directors ("Pace Board") that Pace West Division 401k Plan was underfunded in violation of the Illinois Pension Code. (Foster Response [156] ¶ 27; *see Foster*, 806 F.3d at 970.) Pace's Board of Directors allegedly retaliated: On February 24, 2011 Joseph Ellyin sent Foster a letter purporting to terminate his services as attorney for the Plan committees—an action that Foster notes only the Plan committees themselves are authorized to take. (Foster Response [156] ¶ 29.) Then on April 5, 2011, Joseph Ellyin instructed Jared Gillespie of Principal Life that "[e]ffective immediately,

[Ellyin] need[ed] to approve all non-Principal invoices for the Pace's union plans." (*Id.* ¶ 41.) At the time of this communication, no one at Principal Life knew about Foster's purported termination as counsel; Foster disputes this, but cites no evidence to the contrary. (Foster Response ¶ 36.) Darrell Washington, who is Principal Life's "Relationship Manager" for the Pace plans, notes that Ellyin was Principal Life's "only point of contact for each of the Pace Plans, and he is the individual from whom Principal Life takes direction with respect to the payment of the Pace Plans' expenses." (Washington Affidavit, Exhibit 2 to Principal Life Response [146-2], ¶¶ 6, 9.) According to Foster, Washington "attended all Pace Plan Committee Meetings" and therefore was aware that the Pace Plan Committees had never imposed a requirement that Ellyin approve his invoices. (Foster Statement of Facts [131] ¶ 42.) Principal Life disputes this; though Washington's affidavit confirms that his duties "include attending plan committee meetings and providing updates to the committee about [Principal Life's] services," Principal Life notes that there is no evidence that Washington attended "every single meeting of every Plan Committee." (Washington Affidavit ¶ 7; Principal Life's Response ¶ 42.) Principal Life has not suggested, however, that Washington had a reason to believe the requirement of approval was established by Plan committee action.

Despite the fact that, as Foster emphasizes, only the Pace Plan committees had the authority to order Principal Life to stop paying him, Principal Life complied with Ellyin's directive. Washington asserts that he did not understand Ellyin's instruction to be a "stop payment" order so much as a request that the invoices be reviewed and approved by Ellyin before payment. (Washington Affidavit ¶ 15.) Foster observes, however, that Washington did understand that Ellyin's purpose in the communication was to put a hold on payment of Foster's invoices; as Washington put it in an internal e-mail, "Due to internal reasons Joe was not at liberty to discuss he can not approve the current invoices as of today." (Washington e-mail 4/18/2011, Exhibit 8 to Principal Life's Statement of Fact [145-8].) Foster met with Washington at Principal Life's

office on May 4, 2011 and showed him documents and e-mails concerning the funding dispute regarding the Pace West Division 501k Plan (again, not one for which Principal Life was paying agent). (Washington Affidavit ¶ 15.) Foster advised Washington that only the Pace Plan committees had authority to stop his monthly payments; he believed Pace's directive was an illegal and retaliatory act and demanded to know who it was that had issued this directive. (*Id.*) According to Washington, because Foster, an attorney, became "agitated and combative," made references to legal filings, took notes, and asked "pointed questions," Washington concluded he should not continue the meeting or answer any of Foster's questions without counsel present. (*Id.*).

Foster contends that Washington told him that Principal Life would follow the instructions and orders of only Pace and not the Pace Plan committees. *Foster*, 806 F.3d at 970. Washington denies having said this. (Washington Affidavit ¶ 16.) The parties agree, however, that on June 23, 2011, Foster wrote a letter to Washington, reminding him that the Plan committees had "enter[ed] into a fixed fee contract" with Foster years earlier, and notifying Washington that "Pace is using their relationship with [Principal Life] to retaliate against [Foster] for reporting that Pace was in violation of the Illinois Pension Code" with respect to the Pace West Division 501k Plan. (Foster letter, 6/23/2011, Foster Exhibit A [127-1] at 63.) The letter referred to instructions from Pace as a "stop payment order based on secret instructions from Pace" and warned that such instructions were not authorized by the Plan Committee. (*Id.*) The letter reminded Washington, further, that Principal Life's "client is not Pace but the plans," that Foster had "not been terminated by any of the Plan Committees," and that the only way he could validly be terminated from his position as counsel to the Plan Committees is "joint action of the Plan Committee" or a legal proceeding. (*Id.*) Now that Principal Life had received "actual notice that the action was not authorized by the Plan Committee," Foster warned, "Principal must immediately take corrective action." (*Id.*) Attached to Foster's letter were signed

statements from each of the Pace Plan union committee members affirming that they had not authorized a "stop payment" of Foster's fees. (*Id.*; Principal Life Response ¶ 48.)

Foster contends Principal Life ignored these signed statements and continued to follow the unauthorized instructions rather than those of Pace Plan committees. *Foster*, 806 F.3d at 970. Principal Life has presented evidence, however, that Washington did not in fact ignore the June 23 letter. Instead, the following day, Washington sent an e-mail to Ellyin, stating, "We have received a letter from Frank Foster stating we should be processing [his] invoices." The e-mail asked Ellyin, in his role as "Plan Administrator" to "please provide us with directions on Frank Foster's request." (Washington 6/24/2011 e-mail, Exhibit E to Washington Affidavit; Washington Affidavit ¶ 11.) Washington also sent a message to Principal Life's "compliance department." (Foster Response [156] ¶ 40.) Washington has not explained how, if at all, Ellyin responded to the June 24 message. He does state that "[o]ver the next few weeks," he and other Principal Life officials came to the conclusion that "there was no longer a consensus on each of the plan committees with respect to the payment of Mr. Foster's fees" and that it was therefore appropriate to seek guidance from the plan committees themselves. (Washington Affidavit ¶ 20.) In the meantime, having received no approvals from Mr. Ellyin, Principal Life did not pay any of the invoices Foster submitted. (Principal Life Response [146] ¶¶ 50-54.)

On August 23, 2011, Foster made another demand for payment, referring to Principal Life's failure to pay him as "misconduct." (Foster letter 8/23/11, Foster Exhibit A [127-1] at 77.) Foster's letter asserted that what he referred to as a "stop payment" order from "a Pace employee who Principal Life refused to identify was not authorized by the respective Plan Committee," and stated Foster's belief that Principal Life's own conduct "constitute[d] retaliation against me for reporting to the Pace Board of Directors . . . that Pace was in violation of the Illinois Pension Code" with respect to the Pace West Division Plan. (*Id.*) On September 2, 2011, Principal Life did send letters to every member of each of the Plan committees,

8

requesting instructions about the Foster invoice dispute, and advised Foster of these requests. (Washington Affidavit ¶ 21; Walker letter 9/2/2011, Exhibit G to Affidavit of Donna Schecher, Exhibit 10 to Principal Life's Statement [145-10] at PLI-000960.) Principal Life received no response to these letters for more than a year. (*Id.* ¶ 22.; Foster Response [156] at ¶ 44.) Washington did receive at least one further communication from Pace: Pace's Deputy Executive Director, Melinda Metzger, sent a letter to Washington on September 30, 2011, advising that "[e]ffective immediately, any authorization with respect to the . . . [Pace] Plans now requires two signatures," those of Joseph Ellyin and one of two other Pace officers, Mark Klafeta or Brett Burkhardt. (Metzger letter 9/30/2011, Foster Exhibit A [127-1] at 83.) The letter makes no reference to any Plan committee meeting or resolution to this effect, nor did it come from the Plan Representative, Joseph Ellyin. Washington nevertheless promptly communicated with Pace officers about the proposed two-signature procedure and made no objection to it. (Washington e-mail 10/6/2011, Foster Exhibit A [127-1] at 84-85.) Just days later, on October 12, 2011, Foster wrote to Pete Walker, a "Compliance Analyst" for Principal Life, observing that because "there is no present collective agreement" on the part of the Plan committees, the action of the Committees "when there was collective agreement remains in full force and effect" and required Principal Life to pay Foster's monthly fees. (Foster 10/12/2011 letter, Exhibit 1 to Foster Response [146] at PLI-956.) Several months later, in August 2012, Washington communicated with Klafeta and Burkhardt in an e-mail, attaching information concerning Foster's unpaid invoices. (Washington e-mail 8/2/2012, Exhibit A [127-1] at 76.) Washington noted that none of the invoices had been paid since March 2011 and confirmed that "[w]e have reiterated to our service team if we receive any invoices not to pay without proper authorization." (*Id.*)

On December 30, 2011, Foster sued the Pace Suburban Bus Division and various Pace employees in federal court. (Complaint, *Foster v. Pace*, No. 11 C 9307 (N.D. Ill.) Principal Life

was not a named Defendant. (Foster Response [156] ¶ 47.) Foster settled the case voluntarily in July 2012, agreeing to dismiss the case in return for payment in full by each of the Plans for the period March 1, 2011 through July 31, 2012, on the condition that each Pace Plan would approve of those payments. (*Id.* ¶¶ 48, 49.) Foster agrees that the settlement agreement contemplated his resignation as counsel for each of the Plans, after his contracts were terminated by the Plan Committees' motion to pay his outstanding bills. (*Id.* ¶ 50.) In letters dated September 26, 2012, Joseph Ellyin finally directed payment of all of the invoices from March 2011 to July 30,

2012 in full. (*Id.* ¶ 51; Washington Affidavit ¶¶ 22, 23.) Principal Life issued the checks on September 28; Foster cashed them on October 5, 2012 ,and resigned as counsel for each of the Plans by letters dated September 19, 2012, in accordance with the settlement. (Foster Response ¶¶ 52-55.)

As noted, Washington had reached out to the Plan committee members themselves in September 2011, but there was no response until after the settlement of the *Foster v. Pace* case. Beginning in August 2012, the Committees finally took action. On August 2, 2012, the Plan Committee for the Pace River Division plans passed a resolution to pay Foster's bills for March 2011 through July 2012. (Principal Life Response [146] ¶ 66.) On August 10, 2012, the Pace North Shore 401k Plan Committee took similar action. (*Id.* ¶ 68.) In August 2012, the Pace Heritage Division 401k Plan Committee and the Pace Southwest Division 401k Plan Committee took steps to approve the payment of Foster's bills for March 2011 through July 2012, and then in December 2012 the Pace Heritage Committee appointed a new attorney for the Plan. (Principal Life Response ¶¶ 62, 63, 64.) On August 22, 2012, the West Plan Committee passed a resolution to pay Foster's legal bills from March 2011 through July 2012 in the amount of $26,911.00. (Principal Life Response [146] ¶ 59.) On September 7, 2012, the Trustees of the Pace and ATU Local 1028 Plan took similar action and appointed a new

attorney.  (*Id.* ¶¶ 60, 61.)   None of the material Foster has submitted to this court reflect a decision on the part of the Plans to terminate his employment, but Foster asserts that he received "notice of his termination as plan attorney" from his law partner, Michael P. Mullen, and on September 19, 2012, sent resignation letters to the Plans.  (*Id.* ¶69.)

Foster asserts that he intended to retire no later earlier than December 31, 2022, the end of the year he reaches age 75.  (*Id.* ¶ 70.)  He contends that Principal Life's conduct resulted in his loss of an income stream totaling $1,149,437.  (*Id.* ¶ 71.)  Principal Life denies liability and contends Foster has now been fully paid for all of the invoices he submitted.  Washington's affidavit concludes with statements that to his knowledge, "no one at Principal Life was ever consulted by anyone at Pace about terminating Mr. Foster as the attorney for the Pace Plans" and that no one at Principal Life "ever instructed Pace to terminate Mr. Foster" or "even knew that Mr. Foster was terminated by the Pace Plans" at the time of the original direction from Mr. Ellyin.  (*Id.* ¶ 27.)  Foster disputes these assertions by simply saying they are "false." (Foster Response [156] ¶ 33.)  He cites no evidence to rebut Washington's affidavit.

## **DISCUSSION**

Foster's Amended Complaint, filed in January 2016, asserts a single count against Principal Life:  a claim that by refusing to pay him, Principal Life interfered with prospective economic advantage and with Foster's attorney-client relationship with the Plans.  The Court of Appeals described his claims in these words:

> [Foster] alleged that Pace repeatedly attempted to terminate him but lacked the legal authority to do so. Pace then wrongfully directed Principal to stop paying Foster, again without the legal authority to do so. And even though Pace lacked the legal authority to issue the stop-payment order, and even though Principal was legally bound to accept orders only from the Plan committees, Principal enacted Pace's unlawful directive and stopped paying Foster, an action that harmed Foster's attorney-client relationship with the Pace Plan committees.

*Foster*, 806 F. 3d at 973. Foster contended that Principal Life's actions "caused him to lose income and to suffer damage to his professional reputation." *Id.* at 971. These allegations, the Seventh Circuit concluded, were sufficient to state the elements of a claim of tortious interference under Illinois law. Specifically, those elements are "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Foster*, 806 F.3d at 971 (citations and internal quotations omitted).

In its motion for summary judgment [144], Principal Life asserts that Foster is unable to establish any of these four elements. Principal Life contends Foster had no reasonable expectation that he would continue to work for the Pace-sponsored 401k Plans after Pace management took steps to remove him, or after he resigned as counsel for the plans in 2012. Even if he had such an expectation, Principal Life asserts, Principal Life had no knowledge of it once Principal Life had received Foster's resignation letters. There was no "intentional and unjustified interference," Principal Life asserts; to the contrary, Principal Life acted responsibly in investigating the directions it had received to await approval of Foster's invoices. And Foster suffered no damages as a result of Principal Life's actions, as he was ultimately paid in full for the work he performed prior to his resignation.

In the court's view, there are disputes about these issues. First, the court is not certain that Foster had no reasonable expectation that he would continue to work for the Pace-sponsored Plans after Pace managers soured on him. Each of the Plan committees was composed of equal numbers of union and management members. Assuming, as Foster does (and Principal Life offers no challenge) that the union members supported Foster, management members may not have succeeded in forcing a resolution to oust him at the time it chose to stop approving his invoices. At least until the time of Foster's resignation in September 2012, Foster

could reasonably have expected he would continue working for the Pace committees and being paid for that work.

Principal Life also contends that it had no knowledge of any reasonable expectation of a continued relationship between Foster and the Plans. Principal Life is on more solid ground here, at least from the date of Foster's resignation as part of his settlement with Pace in the late summer of 2012. Foster himself admits the resignation was voluntary, and there is no basis in the record for a conclusion that Principal Life was on notice that it was not. But until the resignation, Principal Life *was* unquestionably on notice of Foster's position. He wrote several times, asserting that he was entitled to be paid and that resolutions authorizing payment of his invoices, adopted years earlier, remained in full force and effect. Until September 2012, Principal Life knew that Foster expected to have a continued attorney-client relationship with the Plan committees and, for the reason explained above (the even numbers of committee members), a jury could find that expectation was reasonable.

Analysis of the third element of this claim—"intentional and unjustified interference"—is more complicated. Principal Life's refusal to pay Foster was, at least on its face, justified by instructions that Principal Life received from Joseph Ellyin. Foster suggests Ellyin was not authorized to speak for the Plan committees, and it is undisputed that the committees never adopted a resolution that reversed the long-standing pattern of payments. But this is an awkward argument, in light of the fact that it was Ellyin who, in March 2005, directed Principal Life to pay Plaintiff's monthly fees "until direction from me to the contrary." Ellyin was in fact the Plan Representative, and the Service and Expense Agreements provided that Principal Life should take instructions from him.

Foster insists Ellyin lacked authority to issue what Foster calls the "stop payment" order in April 2011. The court assumes this is true. The more difficult question is whether Principal Life was entitled or even required to comply with it. Foster notified Principal Life that Pace's

13

motivations were unlawful and retaliatory, and Foster believes Principal Life was on notice that no Plan committee action authorized the notice from Ellyin. He says Washington himself regularly attended committee meetings and knew how things were supposed to work. Foster complains that Principal Life simply ignored his objections, but this is not true: the day after receiving Foster's June 23 letter, Darrell Washington communicated with Ellyin about the issue and asked Ellyin, as "Plan Administrator," to "provide us with directions on Frank Foster's request." Washington also consulted with Principal Life's "compliance" team, who investigated Foster's claims. Unfortunately, the record offers little detail about the nature of the investigation or what findings, if any, resulted. Donna Schecher, a manager at Principal Life who was involved in the investigation, reviewed the Plan documents and the existence (or absence) of Plan committee resolutions, but her affidavit does not reveal any effort to determine what led to Ellyin's April 11 instruction to Principal Life to cease making payments to Foster, or whether that instruction was appropriately authorized. (Schecher Affidavit [145-10] at ¶¶ 7-13.) Nor has Principal Life explained how Ellyin responded to the June 24 request, or whether or how Principal Life followed up. With respect to this third element of the claim of tortious interference, the Seventh Circuit was satisfied by Foster's allegation that Principal Life failed to pay him and "persisted in this course of action even when Foster produced conclusive proof that the Pace Plan committees had not authorized the stop-payment order." The summary judgment record, however, includes (a) evidence going beyond those allegations, including the language of the Service and Expense Agreement, which appears to authorize, if not require, Principal Life to adhere to Ellyin's directions; and (b) evidence that Principal Life wrote letters to every Plan committee member to seek further guidance concerning the matter. The court concludes that a reasonable jury could conclude that Principal Life was on sufficient notice that Ellyin's instruction was unauthorized and that the 2005 directive thus remained in force. A reasonable jury could also conclude, however, that Principal Life took appropriate steps to resolve the confusion, such

that its conduct could not be deemed "intentional and unjustified." The court therefore concludes neither side is entitled to summary judgment on this third element of Foster's tortious interference claim.

That leaves the question of whether Foster was damaged as a result of Principal Life's conduct. Principal Life argues that there are no disputes on this issue because Foster's invoices were ultimately paid in full and he has no claim for losses after his voluntary resignation in September 2012. Foster has acknowledged that his resignation was voluntary but nevertheless insists that, absent Principal Life's conduct, he would have continued as attorney for the Plan committees indefinitely. Even putting his resignation aside, Foster's theory is inconsistent with all of the circumstances. Foster's allegations, and the evidence he has mounted, instead supports the conclusion that his relationship with the Pace plans came to an end not because of Principal Life's conduct, but because of his dispute with Pace managers. As noted, he sued those managers in late 2011, alleging that they froze him out and interfered with his retainer arrangement. The managers took this action against him to retaliate for his presentation of a legal opinion that Pace did not welcome. Pace managers were able to achieve their retaliatory goal because of the unfortunate circumstance that one of their numbers was also appointed Plan Representative and had power to give Principal Life directions. As Principal Life put it, "[w]hether Pace had the [legal] authority to terminate Plaintiff has no bearing on whether Pace's dissatisfaction with Plaintiff was the cause of the breakdown in his relationship with the Pace Plans." (Principal Reply Memorandum [158] at 9.) In short, the breakdown in the relationship between Foster and the Pace plans was caused by a conflict concerning Foster's legal advice, not by Principal Life's response to that conflict.

The fact that the Plan committees are composed of equal numbers of management and union representatives is pivotal here: Foster correctly observes that the management side was not authorized to act on its own. But union officials were likewise unable to act unilaterally once

the other committee members decided, for good reason or ill, that Foster should no longer represent them. In arguing that, "had Principal Life not entered the fray," he would have continued to represent the five plans (Foster Response Memorandum [157] at 14), Foster effectively argues that both sides would have dug in forever, rendering the 2005 resolutions permanent. Respectfully, his argument rests on speculation.

The court concludes that, if a jury finds in Foster's favor on the first three elements of his claim, his damages are limited to amounts, if any, that he has not yet been paid for his work on behalf of the Plan committees through July 2012. The Seventh Circuit observed that "Foster assured us at oral argument that he was not fully compensated for his losses in his settlement with Pace." *Foster*, 806 F.3d at 974. Foster could, for example, be entitled to interest on the sums he would have earned, had he received payment promptly (to the extent he has not already recovered those amounts). Foster has also claimed damage to his reputation. Presumably, harm to his reputation is the reason that Foster, an obviously competent and energetic attorney, has not replaced the income stream he expected to enjoy from his work for the Plan committees. There is no evidence of such harm in the record at all, however, nor has Foster suggested a basis from which a reasonable trier of fact could determine that Foster's reputation was harmed by Principal Life's conduct rather than that of Pace managers.

## **CONCLUSION**

The court concludes disputes of material fact preclude summary judgment on Foster's tortious interference claims, but his damages are limited. Both sides' motions [123, 144] are denied. This case is set for status on October 15, 2018 at 9:00 a.m. The parties are urged to discuss a settlement.

ENTER:

*Rebecca R. Pallmeyer*

Dated: September 30, 2018

_____
REBECCA R. PALLMEYER
United States District Judge